BEA, Circuit Judge,
dissenting:
From its very first sentence, the majority unjustifiably departs from not only our own, but also well-established Supreme Court precedent. We correctly and squarely resolved the questions presented by this' case in United States v. Austin, 676 F.3d 924 (9th Cir. 2012) until it was overruled by today’s majority. In Austin, we considered whether a judge had jurisdiction to modify a prisoner’s sentence under 18 U.S.C. § 3582(c)(2) (permitting modification of a term of imprisonment where that term was “based on” a sentencing range which was later reduced) if the prisoner was sentenced pursuant to a Federal Rules of Criminal Procedure (“F.R.C.P.”) 11(c)(1)(C) plea agreement (a “Rule 11(c)(1)(C) agreement”) that did not expressly incorporate the since-amended sentencing Guidelines.[1] We noted that the Supreme Court had spoken to this very question in Freeman v. United States, 564 U.S. 522, 131 S.Ct. 2685, 180 L.Ed.2d 519 (2011), where five Justices had voted to permit a prisoner to seek sentence modification, but where no single rationale had commanded a five-Justice majority. A four-justice plurality of those five Justices would always permit a prisoner to seek sentence modification, under the rationale that a judge’s approval of the plea agreement is required to start with, and is necessarily “based on,” the since-amended Guidelines. Justice Sotomayor, writing only for herself, agreed that Freeman was entitled to seek resentencing, but only because his plea agreement had expressly incorporated the since-modified sentencing Guidelines. A four-Justiee dissent penned by Chief Justice Roberts would find that Rule 11(c)(1)(C) agreements are always purely contractual in nature and therefore never “based on” the sentencing Guidelines. Given this 4-1-4 split, we held in Austin that we were bound (under Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977)) to treat Justice Sotomayor’s concurrence as the “holding” of the Freeman Court because it was the “narrowest grounds” upon which to reach the disposition that commanded a majority of the Court. See Austin, 676 F.3d at 927-28.
Our interpretation in Austin has garnered the support of eight out of the nine Circuits which have interpreted Freeman. See, e.g., United States v. Graham, 704 F.3d 1275, 1278 (10th Cir. 2013); United States v. Thompson, 714 F.3d 946, 949 (6th Cir. 2013); United States v. Browne, 698 F.3d 1042, 1045-47 (8th Cir. 2012); United States v. Weatherspoon, 696 F.3d 416, 422 (3rd Cir. 2012); United States v. Dixon, 687 F.3d 356, 359-60 (7th Cir. 2012); United States v. Austin, 676 F.3d 924, 927 (9th Cir. 2012); United States v. Rivera-Martinez, 665 F.3d 344, 345 (1st Cir. 2011); United States v. Brown, 653 F.3d 337 (4th *1031 Cir. 2011).[2] The sole outlier circuit: the D.C. Circuit in United States v. Epps, 707 F.3d 337 (D.C. Cir. 2013). Thus, the Majority today rejects a widely accepted interpretation of Freeman in favor of a highly criticized, outlier approach, thus accentuating a Circuit split.
I cannot subscribe to the Majority’s view. To start, the Majority’s “logical subset” requirement is an invention of the D.C. Circuit that finds no support in Marks or any other Supreme Court precedent. The Majority’s “logical subset” invention permits a concurring opinion to become the precedential decision of the Court if, and only if, its reasoning shares all points in common with another, broader opinion that also reaches the majority result. Of course, the concurring opinion may have fewer elements of the decision than does the plurality opinion, but it may not have any elements in conflict. See Maj. Op. at 1021-22. This notion is an invention in our circuit’s jurisprudence, though the Majority tips its hat to the D.C. Circuit. See Maj. Op. at 1016-17, 1020. And even if there were a “logical subset” requirement as defined by the Majority, the Majority misreads Justice Kennedy’s plurality opinion to the extent it concludes that there are circumstances in which Justice Soto-mayor would permit sentence modification but the Kennedy plurality would not. Finally, the Majority’s adoption of the Kennedy plurality’s approach violates stare de-cisis because five Justices in Freeman (a majority), all agreed that we look to the plea agreement itself to determine whether a plea was “based on” the since-modified sentencing Guidelines. Under eases like National Mutual Insurance Co. v. Tidewater Transfer Co., 337 U.S. 582, 69 S.Ct. 1173, 93 L.Ed. 1556 (1949), we are bound by holdings that garner the support of a “majority” of the nine Justices on the entire Court, even if that agreement derives in part from votes from the dissent. Thus, the Majority flouts not only Freeman, but also Supreme Court jurisprudence relating, to the binding effect of splintered Supreme Court opinions, as well as this Court’s structural role as a federal intermediary court.
I. Facts
In 2005, Tyrone Davis pleaded guilty to possession with intent to distribute crack cocaine pursuant to a Rule 11(c)(1)(C) plea agreement. In Davis’s case, the plea agreement did not specifically.mention any particular sentencing Guideline. Nor did the plea agreement itself calculate (or even contain sufficient facts with which to calculate) Davis’s Guidelines range. True, it contained some of the factors that would enable a Guidelines calculation. For example, the parties stipulated to a base offense level of 34. But the agreement failed to list a criminal history category or adjustment determinations — both of which are essential to calculate a sentencing range under the Guidelines. After successive appeals to this Court on grounds no longer relevant, the district court calculated a Guidelines range of 188-235 and approved the 216-month sentence in Davis’s plea agreement.[3] We affirmed. See United States v. *1032 Davis, 389 Fed.Appx. 616 (9th Cir. 2010) (unpublished).
Congress thereafter passed the Fair Sentencing Act of 2010, which increased the threshold amount of cocaine base necessary to trigger an enhanced Guidelines range. Pub L. 111-220, § 2(a), 124 Stat. 2372. Under the new Guidelines, the amount of cocaine base that contributed to Davis’s convictions would produce a Guidelines range of only 97-121 months (after inserting the calculations made by the district court at Davis’s resentencing). Because Davis’ 216-month sentence now falls much above that range, Davis moved in September 2012 for resentencing under 18 U.S.C. § 3582(c)(2), relying on the amended Guidelines. Section 3582(c)(2) provides:
In the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission ... the court may reduce the term of imprisonment, after considering the factors set forth in section 3553(a) to the extent that they are applicable, if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.
Id. (emphasis added). The district court properly denied the motion, ruling that Davis’s 216-month sentence was “based on” his plea agreement, not on the Guidelines range that had since been lowered. The district court relied on our decision in United States v. Austin, 676 F.3d 924, 927-28 (9th Cir. 2011), to hold that it lacked jurisdiction to review Davis’ sentence, which was adopted pursuant to a Rule 11(c)(1)(C) agreement that did not reference any Guidelines range, and therefore did not meet either of Justice Sotoma-yor’s exceptions in Freeman.
The original panel affirmed, citing Austin as the controlling law of the circuit. United States v. Davis, No. 13-30133, op. at 1016-17.[4] This case was successfully called en banc to reconsider our prior determination that, under the methodology prescribed by Marks, Justice Sotomayor’s concurrence in Freeman constitutes the binding “holding” of that case.
II. Legal Analysis
A.
In Marks v. United States, the Supreme Court made clear that even splintered determinations of our highest court are binding on lower federal courts: “When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, ‘the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds....’” Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (reversing the Sixth Circuit’s determination that Memoirs v. Massachu *1033 setts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966), had no binding prece-dential effect because it was a plurality opinion). At issue in Marks was the prece-dential effect of Memoirs — an earlier, splintered Supreme Court opinion. In Memoirs, a three-Justice plurality had held that sexually explicit literature was constitutionally protected unless it met the three-part definition of obscenity set forth in Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957).[5] See Marks, 430 U.S. at 193, 97 S.Ct. 990 (citing Memoirs, 383 U.S. at 421, 86 S.Ct. 975). Justices Black and Douglas (both writing separately) concurred in Memoirs on the broader grounds that the First Amendment prohibits government censorship of any “obscene” material. See Memoirs, 383 U.S. at 421, 424-33, 86 S.Ct. 975. Finally, Justice Stewart concurred based on his somewhat different view that only “hardcore pornography” may constitutionally be suppressed. Id. at 421, 86 S.Ct. 975 (citing his dissenting opinion in Mishkin v. State of N.Y., 383 U.S. 502, 518, 86 S.Ct. 958, 16 L.Ed.2d 56 (1966)). In sum, six Justices agreed that the material at issue in Memoirs was protected by the First Amendment, but no five Justices agreed about the scope of First Amendment protection for sexually explicit material — nor about the proper reasoning to be employed to reach that result. In this circumstance, Marks explained, the three-Justice Memoirs plurality opinion, which applied the Roth tests, “constituted the holding of the Court and provided the governing standards,” because it was the “narrowest grounds” for finding First Amendment protection. Marks, 430 U.S. at 193-94, 97 S.Ct. 990.
The Majority today rejects the only application of Marks to Freeman that is consistent with stare decisis in favor of a widely-criticized approach endorsed by one panel in the D.C. Circuit in United States v. Epps, 707 F.3d 337, 351 (D.C. Cir. 2013).[6] The Majority holds that Marks produces a “controlling” opinion only when the “narrowest grounds” in a splintered opinion is “represents] a common denominator of the Court’s reasoning,” meaning “the reasoning of a narrower opinion fit[s] entirely into the circle drawn by a broader opinion.” Maj. Op. at 1021.
*1034 The Majority’s adoption of a reasoning-based, “common denominator” approach is fundamentally inconsistent with Marks itself. In Memoirs, none of Justices Stewart, Black, or Douglas agreed with the rule enumerated by the Justice Brennan plurality (that the Court should apply the Roth test to determine whether speech is constitutionally protected). Thus, there was no “common denominator” in Memoirs, as that term is defined by the Majority today. Yet, Marks applied the three-justice plurality opinion authored by Justice Brennan. It is true, of course, that in every circumstances in which the Brennan plurality would find speech protected under the Roth obscenity test, Justices Black and Douglas (who ascribe to the broader view that obscene speech is always constitutionally protected) would agree with the plurality’s result. But there is a distinction between agreement with a result and agreement with the reasoning that leads one to adopt that result that appears to be lost on my colleagues in the Majority. Indeed, the Majority’s own reasoning supports only a votes-based reading of Marks: Justice Brennan’s plurality opinion was the “narrowest grounds” for the Court’s holding in Memoirs because it would always produce a result with which at least five Justices would agree.[7]
This reading is also consistent with Marks’ dictate that “the holding of the Court ... [is] the position taken by those Members who concurred in the judgment on the narrowest grounds.... ” Marks, 430 U.S. at 193, 97 S.Ct. 990 (emphasis *1035 added). Marks’ emphasis on the Court’s “judgment” demonstrates that it is the ultimate “vote” of five Justices that is important in determining the binding effect of a splintered Supreme Court opinion. That is, Marks requires us to find a “legal standard which, when applied, will necessarily produce results with which a majority of the Court from that case would agree.” United States v. Williams, 435 F.3d 1148, 1157 n. 9 (9th Cir. 2006) (emphasis added). That is not to say, of course, that the respective rationales of a splintered Supreme Court decision are irrelevant. Consideration of competing rationales is necessary to determine which would consistently produce a result with which a majority of the Court would agree. But the Majority’s reasoning-based approach must be incorrect, because there was no common reasoning in Memoirs, yet the Marks Court was nonetheless able to derive from Memoirs a binding rule, which it applied in Marks.
The Majority’s adoption of a “logical subset” precondition to Marks applicability is plagued by the same logical fallacy. King v. Palmer, the D.C. Circuit case on which the Majority relied, justified its invention of a logical subset requirement on the grounds that:
Marks is problematic ] [i]f applied in situations where the various opinions supporting the judgment are mutually exclusive [because] Marks will turn a single opinion that lacks majority support into national law. When eight of nine Justices do not subscribe to a given approach to a legal question, it surely cannot be proper to endow that approach with controlling force.... ”
King v. Palmer, 950 F.2d 771, 782 (D.C. Cir. 1991). Even accepting, arguendo, the King court’s premise that a concurring opinion should be given stare decisis effect only when it consistently produces a result with which a majority of the Court would agree, that, again, would support the adoption of a rule that it is each Justice’s vote, and not his reasoning, that counts under Marks. The King court’s conclusion that Marks “works” only when a majority of Justices “subscribe to a given approach to a legal question,” such that “one opinion supporting the judgment ... fit[s] entirely within a broader circle drawn by the others,” id. at 782, simply does not follow from that court’s premise — or from the many Supreme Court precedents interpreting and applying Marks to splintered opinions over the last four decades.[8] Indeed, to require complete overlap between both the result and the reasoning of Justices in the majority before a binding rule can be discerned renders Marks a virtual nullity. Agreement as to both the Court’s reasoning and its result does not produce a concurring opinion — it produces a “join.”
*1036 And even if a reasoning-based approach to Marks were not fundamentally incompatible with Marks itself, the idea that a court’s holding, adopted by a majority of judges, must have a rationale common throughout the majority is a novelty to any branch of our government, including the judiciary. Even our courts adhere to that most democratic of principles: as to how to decide this ease, the majority rules. People, including legislators and judges, may vote for a result for a variety of different reasons. That is how coalitions are achieved and compromises made to reach results although the distinct motives and thinking which produced the majority’s result remain quite distinct.
It is the result produced by majority vote that determines the stare decisis effect of the judgment. That is because whether the majority voté is produced by the adoption of one rationale or two, the rule of law made — the decision' — 'is based on a rationale or rationales expected to remain the same and produce the same result in the next applicable case. After all, “stare decisis” means “to stand by things decided.”
B.
A simple application of Marks’ methodology to Freeman compels a finding that Justice Sotomayor’s concurrence is the “holding” of Freeman. See United States v. Austin, 676 F.3d 924, 927-28 (9th Cm. 2012). Five members of the Court agreed that Freeman — who had been sentenced pursuant to a Rule 11(c)(1)(C) agreement — was eligible for sentencing modification under 18 U.S.C. § 3582(c)(2), because his plea agreement had been “based on” a subsequently modified sentencing Guidelines range. Freeman v. U.S., 564 U.S. 522, 534, 544, 131 S.Ct. 2685, 180 L.Ed.2d 519 (2011). Writing for a four-member plurality, Justice Kennedy reasoned that a plea agreement is “based on” applicable Guidelines whenever the sentencing judge at least consulted those guidelines before approving the proposed sentence — which, Justice Kennedy explained, the judge is statutorily “required” to do in “every case.” See Freeman, 564 U.S. at 529, 131 S.Ct. 2685 (plurality opinion).
Concurring in result, Justice Sotomayor, a former district court judge experienced in actual sentencing, reasoned that plea agreements are sometimes based on sentencing guidelines, but only when the agreement itself “expressly uses a Guidelines sentencing range applicable to the charged offense to establish the term of imprisonment,” or the sentencing range is otherwise “evident from the agreement itself.” Id. at 534, 539, 131 S.Ct. 2685 (Soto-mayor, J., concurring) (emphasis added). Chief Justice Roberts, writing for the four dissenting Justices, “agree[d] with Justice Sotomayor that ‘the term of imprisonment imposed pursuant to a [Rule 11(c)(1)(C) ] agreement is ... based on the agreement itself’ ” Id. at 544, 131 S.Ct. 2685 (Roberts, C.J., dissenting) (emphasis added) (internal quotation marks omitted). However, the dissent would find that plea agreements are a matter of contract and thus never “based on” the sentencing Guidelines. Id. at 544-51, 131 S.Ct. 2685 (Roberts, C.J., dissenting).
Justice Sotomayor’s opinion is controlling because “ ‘sometimes’ is the middle ground between ‘always’ and ‘never.’ ” See United States v. Duvall, 740 F.3d 604, 612 (D.C. Cir. 2013) (Kavanaugh, J., concurring in the denial of rehearing en banc); see also supra, n.6. In circumstances in which Justice Sotomayor would permit reduction of a prior sentence, so too would the plurality (resulting in a five-Justice majority). Where Justice Sotomayor’s criterion are not met, she would find agreement in the four-Justice dissent that the prisoner’s sentence is not “based on” the *1037 Guidelines (which would also result in a five-justice majority). Justice Sotomayor’s approach therefore constitutes the “narrowest grounds” for reaching a result that, in any circumstance, will be consistent with the result that a majority of the Supreme Court would reach under Freeman.
Under Justice Sotomayor’s framework, Davis cannot seek resentencing, because his plea agreement does not meet either of her exceptions. It neither expressly cites, nor otherwise manifests that it is predicated upon, any particular Guidelines range. In fact, it omits several details (such as criminal history, and adjustments) necessary even to calculate a Guidelines range. Davis’s sentence is therefore not subject to modification under § 3582(c)(2). The district court correctly determined that it lacked jurisdiction to resentence Davis, and the panel should affirm on that basis.
The Majority rejects this straight-forward approach on the grounds that circumstances could arise in which Justice Sotomayor would find a plea “based on” sentencing guidelines, but the Kennedy plurality would not. The Majority posits two hypothetical, both of which assume express agreement in a plea bargain that a particular sentencing range applies (such that Justice Sotomayor would find the plea agreement “based on” the sentencing Guidelines, and subject to § 3582(c)(2) re-sentencing). See Maj. Op. at 1022-23. Both hypothetical then posit that the “sentencing court ... might consider and reject the guideline range used by the parties” — in one scenario because the judge believed another range should apply, and, in the other, for “policy” reasons. Id. The Majority suggests that in either of these circumstances, the Freeman plurality would not find the plea agreement “based on” the sentencing guidelines, and thus would not grant relief.
The Majority is simply incorrect. The very fact that the sentencing judge in the Majority’s hypothetical must reject the Guidelines range recommended by the parties necessarily presupposes that the judge’s analysis started with a consideration of the Guidelines range recommended in the plea agreement. Under the Kennedy plurality’s approach, this consideration, at the inception of the sentencing, is enough to entitle a defendant to seek resentencing — regardless of the judge’s ultimate reasons for approving the plea agreement. See Freeman, 564 U.S. at 529-30, 131 S.Ct. 2685 (plurality opinion)' (“[I]f the judge uses the sentencing range as the beginning point to explain the decision to deviate from it, then the Guidelines are in a real sense a basis for the sentence.” (emphases added)). The Majority recognizes as much on page 1026 of its opinion, wherein it quotes Justice Kennedy’s statement that “the applicable Guidelines policy statement ‘forbids the district judge to accept an 11(c)(1)(C) agreement without first evaluating the recommended sentence’ under the Guidelines.” Maj. Op. at 1026 (quoting Freeman, 564 U.S. at 529, 131 S.Ct. 2685, and USSG § 6B1.2(c)).
The Majority criticizes my reading of Justice Kennedy’s plurality opinion — a reading adopted by an overwhelming majority of circuits — as “oversimplified.” In support of its more limited reading, the Majority relies solely on Justice Kennedy’s statement that a “recommended sentence is likely to be based on the Guidelines.” Maj. Op. at 1022 n. 9 (quoting Freeman, 564 U.S. at 534, 131 S.Ct. 2685).
But Justice Kennedy’s use of the word “likely” in one sentence cannot be read in isolation. In the immediately preceding paragraph, Justice Kennedy in fact rejects the notion — advanced by the Majority— that his approach would limit relief to only a “subset of defendants.” Freeman, 564 U.S. at 533-34, 131 S.Ct. 2685 (“[When] [t]he Commission determine[s] that [the] *1038 Guidelines [are] flawed, and therefore that sentences that relied on them ought to be reexamined[,] [tjhere is no good reason to extend the benefit of the Commission’s judgment only to an arbitrary subset of defendants whose sentences were accepted in light of a since-rejected Guidelines range based on whether their plea agreements refer to the Guidelines.”). Indeed, Justice Kennedy criticizes Justice Sotoma-yor’s approach because it would fail to permit resentencing in all cases: “Congress enacted § 3582(c)(2) to remedy systemic injustice, and the approach outlined in [Justice Sotomayor’s] opinion concurring in the judgment would undercut a systemic solution.” Id. at 534, 131 S.Ct. 2685 (emphasis added).
Nothing about Justice Kennedy’s opinion suggests any exceptions. He notes that the “Guidelines require the district judge to give due consideration to the relevant sentencing range, even if the defendant and prosecutor recommend a specific sentence as a condition of the guilty plea.” Id. at 530, 131 S.Ct. 2685 (emphases added). He further reasons that “[federal sentencing law requires” the sentencing judge to look to the Guidelines as “a framework or starting point” in “every case.” Id. at 529, 131 S.Ct. 2685. Thus, notwithstanding his use of the word “likely” in one sentence, Justice Kennedy’s opinion is most reasonably read as endorsing an approach under which a defendant may “always” seek re-sentencing on the basis of amended Guidelines. Certainly, for the reasons already stated above, Justice Kennedy would permit a defendant to seek resentencing in the examples given by the Majority.
The Majority imbues far more meaning into Justice Kennedy’s single use of the word “likely” than the rest of Justice Kennedy’s plurality opinion can bear. It may be that Justice Kennedy simply did not want to speak in absolutes. That is, he declined to say, as a matter of empirical fact, that a judge always consults the sentencing Guidelines, because there is always the possibility that a judge could make a mistake or fail to follow the law. But one thing is for sure: Justice Kennedy does not even hint at a case in which the sentencing judge could lawfully start sentencing with any consideration other than the Guidelines, and the Majority has not suggested any either. See 18 U.S.C. § 3553 (directing that a “court, in determining the particular sentence to be imposed, shall consider ... the sentencing range established for ... the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines” (emphasis added)); see also Gall v. United States, 552 U.S. 38, 49, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007) (“[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.” (citing Rita v. United States, 551 U.S. 338, 347-48, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007))).
Indeed, the failure of a sentencing judge to start the calculation of a sentence by considering the applicable sentencing Guidelines is in itself grounds for reversal for resentencing. See Gall, 552 U.S. at 51, 128 S.Ct. 586 (instructing that appellate courts must “first ensure that the district court committed no significant procedural error, such as failing to calculate ... the Guidelines range”); United States v. Denton, 611 F.3d 646, 651 (9th Cir. 2010) (explaining that “[a] failure to calculate the correct advisory range constitutes procedural error” justifying reversal and remand for resentencing); United States v. Hammons, 558 F.3d 1100, 1106 (9th Cir. 2009) (holding that a sentencing court “committed plain error by failing to ... calculate the applicable] guideline range” *1039 and vacating and remanding for resentenc-ing).
The Majority’s contrary analysis appears to substitute the Freeman plurality’s requirement that a trial judge “consider” the Guidelines with its own innovation— that the trial judge must base his ultimate acceptance of the plea agreement on the Guidelines in order for a defendant to be entitled to seek resentencing. See Maj. Op. at 1022-23. But the latter is not the test enumerated by Justice Kennedy in Freeman. Properly read, Justice Kennedy’s opinion would unquestionably permit re-sentencing in the hypotheticals offered by the Majority. See id. Thus, even if the Majority were correct that Marks applies only when one opinion is a “logical subset” of another, that precondition would be met here.
C.
But even putting aside the “logical subset” issue, the Majority still cannot reach its result consistent with basic principles of stare decisis for the independent reason that we, as a federal intermediate court, are bound by holdings upon which five Justices of the Court agree — even if that agreement derives in part from dissenting Justices. The Supreme Court’s fragmented decision in National Mutual Insurance Co. v. Tidewater Transfer Co., 337 U.S. 582, 69 S.Ct. 1173, 93 L.Ed. 1556 (1949), is a famous illustration of this principle.[9] *1040 Since Tidewater, courts have universally accepted that Congress may not expand the scope of subject-matter jurisdiction conferred by Article III through passage of a Congressional Act.[10] Yet this rule can be divined only by combining a two-Justice concurrence in Tidewater with a four-justice dissent. See id. at 604-46, 69 S.Ct. 1173.
United States v. Jacobsen, 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984), provides a more recent example of the same rule. The question in Jacobsen was the government’s authority to conduct a war-rantless search on the heels of a private search that identified potential contraband. The Jacobsen Court extracted the “controlling” legal standard from its prior precedent in Walter v. United States, 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980), by combining the opinion of the Walter Court (which garnered only two votes) with the opinion of four dissenting Justices, which it described as the “standard ... adopted by the majority of the Court in Walter....” Id. at 116-17, 104 S.Ct. 1652 & n. 12 (emphasis added).
In Walter, a private party had opened a package containing films that, from the descriptions on the packaging, the private party concluded were contraband. Walter v. United States, 447 U.S. 649, 651-52, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980). The government seized the films and, without obtaining a warrant, screened them from a projector. Id. at 652, 100 S.Ct. 2395. Delivering the two-Justice opinion of the Court, Justice Stevens reasoned that the government had violated the defendant’s Fourth Amendment rights by actually watching films because the private party’s search had consisted only of opening the package that contained the films. Id. at 657, 100 S.Ct. 2395 (The FBI’s subsequent screening of such films constituted an “expansion of the search that had been conducted previously by the private party.”); see also Jacobsen, 466 U.S. at 115-16, 104 S.Ct. 1652 (quoting Walter, 447 U.S. at 657, 100 S.Ct. 2395 (Opinion of Stevens, J., joined by Stewart, J.)). Three Justices in Walter concurred in the judgment on the grounds that the government had exceeded its authority under the “plain view” doctrine, but expressly rejected the notion that the scope of one’s Fourth Amendment right could be tethered to the scope of an antecedent private search. Walter, 447 U.S. at 660-62, 100 S.Ct. 2395 (White, J., concurring). A four-justice dissent agreed with Justice Stevens that the legality of a governmental search depended on the scope of the private party’s antecedent search, but would have found no constitutional violation because “the FBI’s subsequent viewing of the movies on a.projector did not ‘change the nature of the search’ and [thus] was not an additional search subject to the warrant requirement.” Id. at 663-64, 100 S.Ct. 2395 (Blackmun, J., dissenting); *1041 see also Jacobsen, 466 U.S. at 116, 104 S.Ct. 1652.
Presented with these competing views in Walter, the Jacobsen Court (in a six-Justice opinion of the Court) held that “a majority [in Walter] did agree on the appropriate analysis of a governmental search which follows on the heels of a private one. Two Justices [referring to Justices Stevens and Stewart].... [and] [f]our additional Justices [referring to the dissent] were ... of the view that the legality of the governmental search must be tested by the scope of the antecedent private search.” Jacobsen, 466 U.S. at 115— 16, 104 S.Ct. 1652. The Majority opinion here simply cannot be squared with the Court’s reading of Walter in Jacobsen. Ja-cobsen recognized that the rule adopted by the two-Justice plurality in Walter was the precedential holding of the Walter Court, because it garnered the approval of six Justices (a majority) of the Court. This was so even though the three-Justice concurrence specifically rejected the plurality’s rationale, and thus neither the plurality opinion nor the concurrence was a “logical subset” of the other.
Moses H. Cone Mem’l Hosp. v. Mercury Const. Corp., 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) [hereinafter, “Memorial Hospital”] provides yet another example. There, the Court considered whether a lower court was bound to apply the Colorado River test,[11] notwithstanding that a four-justice plurality in Will v. Calvert Fire Insurance Co., 437 U.S. 655, 98 S.Ct. 2552, 57 L.Ed.2d 504 (1978), had purported to overrule it. Id. at 17, 103 S.Ct. 927. The Memorial Hospital Court affirmed that the “Court of Appeals [had] correctly recognized that the four dissenting Justices and Justice Blackmun [who concurred in judgment in Will] formed a majority to require application of the Colorado River test.” Id. (emphases added). By holding that the Fourth Circuit had “correctly recognized” that it was “require[d]” to apply the Colorado River test by virtue of a five-Justice majority comprised of four dissenting Justices and one concurring Justice, id. the Supreme Court in Memorial Hospital confirmed that its precedents relating to the consideration of dissenting opinions do bind us as a federal intermediate court (contrary to the suggestion of my concurring colleagues).
The Majority is correct that the Justices in Freeman did not agree on much. But a five-Justice majority (Justice Sotomayor, plus the four dissenting Justices) did agree on one point — that a sentence imposed under a Rule 11(c)(1)(C) plea agreement is always “based on the [plea] agreement” itself. See, e.g., Freeman, 564 U.S. at 534, 131 S.Ct. 2685 (Sotomayor, J., concurring) (“[T]he term of imprisonment imposed by a district court pursuant to an agreement *1042 authorized by Federal Rule of Criminal Procedure 11(c)(1)(C) ... agreement ] is ‘based ori the agreement itself, not on the judge’s calculation of the Sentencing Guidelines.”); see also id. at 544, 131 S.Ct. 2685 (Roberts, C.J., dissenting) (“I agree with Justice SOTOMAYOR that ‘the term of imprisonment imposed pursuant to a [Rule 11(c)(1)(C)] agreement is, for purposes of § 3582(c)(2), “based on” the agreement itself.’ ” (quoting Justice Soto-mayor’s concurrence, id. at 534, 131 S.Ct. 2685)). This was a holding that received the vote of five Justices (a majority) of the Court. Like the Fourth Circuit in Memorial Hospital, we are bound by that holding.[12]
The Majority blatantly ignores Chief Justice Roberts’ express agreement with Justice Sotomayor and focuses only on the disagreements between them. But of course there are points on which they disagree; that is why there is both a concurrence and a dissent in Freeman (just as there was ample disagreement between the concurring and dissenting Justices in Tidewater). But those disagreements do not negate the fact that there are no sentence reductions which Justice Sotomayor would deny that the four dissenting Justices would not also deny. Where, as here, a plea agreement contains no mention of either the sentencing Guidelines or the criteria'necessary to calculate the applicable Guidelines range (Justice Sotomayor’s *1043 two exceptions), five Justices in Freeman (Justices Sotomayor, Roberts, Scalia, Thomas, and Alito) would always vote to deny the defendant’s petition to seek re-sentencing. Under Marks, we are bound by this result.
In sum, the Majority makes a good case that “federal sentencing law,” Rule 11(c)(1)(C), and the Guidelines’ policy statements all support the view adopted by the Justice Kennedy plurality in Freeman. See Maj. Op. at 1026-27. And these arguments may well be the basis for a future Supreme Court opinion abrogating Freeman and adopting outright the plurality opinion of Justice Kennedy. Rut that is the Court’s province, not ours. As an intermediate federal court, we are not free to disregard binding Supreme Court precedent simply because we can think of a rule we like better. The purpose of determining a “holding” is to apply stare decisis in decisions by intermediate appellate courts. It is only by intermediate courts following the holdings of the Supreme Court that one can hope to have predictability of law — the Rule of Law — from intermediate courts of appeal. While I may not agree with Justice Sotomayor’s approach, I think Marks constrains our discretion. The Majority today defies stare decisis by adopting a contrary approach and result.
For all of these reasons, we had it right in Austin, and I respectfully dissent.

. A Rule 11(c)(1)(C) agreement may or may not specifically reference applicable sentencing guidelines as the basis for the government's sentencing recommendation. See Fed. R. Crim. P. 11.

. See also United States v. Banks, 770 F.3d 346, 351 (5th Cir. 2014) (citing to Justice Sotomayor's concurrence in Freeman and suggesting that, were that case applicable, the Fifth Circuit would be bound by Justice Soto-mayor’s concurrence).

. At Davis’s sentencing in May 2006, the district court calculated a Guidelines range of 235-293 months (later reduced, on remand, to 188-235 months, as described below), relying in part on its own determinations that Davis’s criminal history category was II and that Davis deserved a 4-level leadership enhancement for his particular role in the offenses. Although Davis's stipulated sentence of 216 months (18 years) fell below the low end of the Guidelines range (235-293 months), the district court accepted the sentence.
*1032 David appealed, arguing that the district court miscalculated the Guidelines range, and our panel reversed and remanded for resen-tencing. United States v. Davis, 312 Fed.Appx. 909, 912-13 (9th Cir. 2009) (unpublished). On remand, the district court held an evidentiary hearing about Davis’s role in the offense, and then calculated a new (lower) Guidelines range of 188-235 months. The court then reimposed the same 216-month sentence as stipulated in the Rule 11(c)(1)(C) plea agreement. On a second appeal, we affirmed. See United States v. Davis, 389 Fed.Appx. 616 (9th Cir. 2010) (unpublished).

. The panel engaged in a straight-forward application of Justice Sotomayor’s binding concurrence in Freeman-. First, the agreement did not provide that Davis be sentenced within a particular Guideline range. Id. at 6. Second, it did not expressly use a Guideline range that “was evident from the agreement itself' to arrive at the 216-month term of imprisonment. Id. Judge Berzon concurred in judgment, but urged us to overrule Austin as wrongly decided. She viewed the decision to have misapplied Marks to Freeman. Id. at 8-10 (Berzon, J., concurring).

. The proper test, as enumerated by the three-Justice plurality, was “ 'whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest.’.... Under this definition ... three elements must coalesce: it must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value.” A Book Named “John Cleland’s Memoirs of a Woman of Pleasure’’ v. Attorney Gen. of Com. of Mass., 383 U.S. 413, 418, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966).

. In addition to being widely rejected by our sister circuits, Epps has been criticized even within the D.C. Circuit. As Judge Kavanaugh contended in United States v. Duvall, 740 F.3d 604 (D.C. Cir. 2013):
Following Justice Sotomayor’s opinion with regard to the "based on” issue would produce results with which a majority of the Supreme Court in Freeman would agree because — to put it in simple terms — "sometimes” is a middle ground between “always” and “never.” In other words, when Justice Sotomayor concludes that a plea agreement was based on the Guidelines, she would agree with the result reached under Justice Kennedy's opinion for four Justices. When she concludes that a plea agreement was not based on the Guidelines, she would agree with the result reached under Chief Justice Roberts's opinion for four Justices. But unlike every other court of appeals, Epps did not follow this commonsense approach to interpreting Freeman.
Id. at 612 (emphasis added).

. The Majority argues that their approach is not "fundamentally inconsistent with Maries itself.” Maj. Op. at 1021-22, n. 7. This, because I have not identified a subsequent Supreme Court case that has unequivocally stated that Marks requires an unwavering focus on results. But, as explained above, the Majority overlooks Marks itself. Under the rule the Majority advances today, we would be unable to derive a controlling rule from Memoirs, the earlier Supreme Court case with respect to which the Court in Maries was called upon to give binding effect. Yet that would be directly contrary to Marks’ holding that we can derive a controlling rule from Memoirs.
By the same token, the Majority's rule would preclude us from deriving a binding rule from Walter v. United States, 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980), where five Justices voted that the government’s warrantless seizure of contraband films and viewing of those films on a projector violated the defendant’s Fourth Amendment right. Id. at 652, 657, 660-62, 100 S.Ct. 2395. Two Justices voted for this result on the grounds that the government’s act of viewing the films expanded the scope of a private party’s earlier search, which had consisted only of opening the package that contained the films. Id. at 657, 100 S.Ct. 2395. Three Justices voted for this result for a completely different reason: that the government had exceeded its authority under the "plain view” doctrine. Id. at 660-62, 100 S.Ct. 2395. Thus, neither the approach adopted by the plurality nor the approach advanced by the concurrence was a "logical subset” of the other; and under the rule the Majority announces today, we could discern no "controlling” rule in Walter.
Yet such a conclusion is inconsistent with the Court's holding, only three years later in Jacobsen, that Walter did set forth a controlling rule: the rule advanced by the two-Justice plurality. See United States v. Jacobsen, 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). The plurality’s view was the "controlling” rule of Walter, because four Justices in dissent had also voted for the plurality’s rule. Id. at 115-16, 104 S.Ct. 1652 ("[A] majority” in Walter "agree[dj” that "the legality of the governmental search must be tested by the scope of the antecedent private search.”). Like in Maries, it was the vote of a majority of Justices that counted. I need not belabor the point, discussed more thoroughly infra, at pp. 1039-41, here. Suffice it to say that, as a federal intermediary court, we are not free to adopt a reasoning-based approach to Marks— an approach plainly inconsistent with the facts and holdings of Marks and later Supreme Court cases interpreting splintered opinions — simply because the Court has not yet had occasion expressly to reject that reasoning-based approach.

. The Supreme Court has never adopted a "logical subset” requirement in its numerous applications of Marks over the past four decades. The Supreme Court has on numerous occasions applied Marks to its own decisions. See, e.g., Glossip v. Gross, -U.S.-, 135 S.Ct. 2726, 2738 n. 2, 192 L.Ed.2d 761 (2015) (holding that a three-Justice plurality opinion constituted the "holding” of the Court in Baze v. Rees, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008), because Justices Scalia and Thomas had concurred in the result reached by the plurality but on "broader” grounds); Panetti v. Quarterman, 551 U.S. 930, 949, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007) (citing Marks and holding simply that "Justice Powell’s concurrence [in Ford v. Wainwright, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) ], ... offered a more limited holding. When there is no majority opinion, the narrower holding controls.”). In neither of these cases did the Supreme Court state that the controlling opinion must be a “logical subset” of the broader view that produces the same result — it has only reiterated that the controlling opinion is the one that relies on "narrower” grounds.

. The question in Tidewater was whether Congress's amendment to 28 U.S.C. § 1332 to permit citizens of the District of Columbia to be characterized as "citizens of a state” for purposes of diversity jurisdiction was constitutional under Article III. The problem in that case was that the Supreme Court had previously addressed that same question (albeit in the absence of a Congressional statute) and had interpreted Article Ill’s reference to "citizens of a state” as not encompassing citizens of the District of Columbia. See Hepburn & Dundas v. Ellzey, 6 U.S. (2 Cranch.) 445, 2 L.Ed. 332 (1805); see also U.S. Const. art. III, § 2, cl. 1 ("Federal courts will have jurisdiction over: ... citizens of a state....”). Nevertheless, by a vote of 5 to 4, the Tidewater Court upheld the constitutionality of a Congressional grant of diversity jurisdiction to citizens of Washington D.C., though no five justices agreed on a rationale.
Writing for a three-justice plurality, Justice Jackson voted to uphold the statute under the rationale that Congress has the power to expand Article III by statute and thereby to confer subject-matter jurisdiction on bases not specified in Article III. See id. at 583-603, 69 S.Ct. 1173. That is, Justice Jackson would not disturb Hepburn’s interpretation of Article III; he would simply hold that Congress may simply add a new basis for jurisdiction that does not exist in Article III. In a concurrence, Justice Rutledge, joined by Justice Murphy, strenuously disagreed that Congress - had the power to expand Article III jurisdiction beyond the bases enumerated in the Constitution. See id. at 604-17, 69 S.Ct. 1173. Nevertheless, Justice Rutledge would overrule Hepburn’s interpretation of Article III and would reinterpret Article Ill’s reference to "citizen[s] of a state” as including citizens of Washington D.C. See id. at 617-626, 69 S.Ct. 1173. Justice Rutledge reasoned that "nothing but naked precedent, ... and the prestige of [Justice] Marshall’s name, supports ... [the] unjust and discriminatory exclusion of District citizens from the federal courts. All of the reasons of justice, convenience, and practicality ... point to the conclusion that [citizens of the District of Columbia] should enter freely and fully as other citizens and even aliens do.” Id. at 617, 69 S.Ct. 1173. The four remaining Justices would have declined to overrule Hepburn-, but they — like Justice Rutledge — also vehemently rejected Justice Jackson’s suggestion that Congress had the power to create subject-matter jurisdiction not conferred by Article III. Thus, based on the rationale that the Court was bound by Justice Marshall’s interpretation of Article III in Hep-bum, and that Congress lacked authority to expand Article III, the dissenting Justices would have found the statute unconstitutional. See id. at 626-46, 69 S.Ct. 1173. In sum, six Justices agreed that Congress could not expand the scope of subject-matter jurisdiction of Article III courts beyond that provided by the Constitution. This view — which finds majority support only by combining the views of two concurring and four dissenting justices — is the governing rule. Tidewater therefore demonstrates that a "majority” view of *1040 the Court that binds us as intermediate courts may be comprised of dissenting and concurring justices, regardless of the quite obvious lack of any "logical subset” between the views expressed by the concurring and dissenting Justices.

. See, e.g., Seminole Tribe of Florida v. Florida, 517 U.S. 44, 65, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (describing as "fundamental” the notion "that Congress could not expand the jurisdiction of the federal courts beyond the bounds of Article III” and overruling Pennsylvania v. Union Gas Co., 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989) to the extent it suggested otherwise); Rosmer v. Pfizer Inc., 263 F.3d 110, 120 n. 5 (4th Cir. 2001) (citing Tidewater for the proposition that “Congress cannot confer jurisdiction on Article III courts by statute when Article III does not authorize that jurisdiction.”); Lo Duca v. United States, 93 F.3d 1100, 1108 (2d Cir. 1996) (explaining that “[i]n Tidewater, ... six Justices reaffirmed the traditional view that federal courts are courts of limited jurisdiction whose judicial powers are bounded by Article III,” a notion that dates “as far back as Marbury v. Madison.... ”).

. Colorado River held that federal courts have discretion in “exceptional” circumstances to stay federal court proceedings pending the resolution of a parallel state court proceeding. See Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 813, 817-18, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976) (recognizing, however, that "[a]b-stention from the exercise of federal jurisdiction is the exception, not the rule”). The "Colorado River test” refers to the list of factors courts consider in determining whether to invoke this exceptional prudential abstention doctrine. These factors include: (a) the extent to which the federal legislation pursuant to which the federal suit is brought favors the state versus federal forum; (b) which forum offers the "greatest experience and expertise” in the particular subject-matter; (c) the “absence of any substantial progress in the federal-court litigation”; (d) the extent to which the suit involves questions or “rights governed by state law”; (e) "the geographical inconvenience of the federal forum”; (f) "the desirability of avoiding piecemeal litigation”; (g) "the order in which jurisdiction was obtained by ihe concurrent forums”; and (h) "the Government’s previous willingness to litigate similar suits in state court.” Memorial Hospital, 460 U.S. at 16, 103 S.Ct. 927.

. The Majority incorrectly suggests that Tidewater and its progeny somehow support a reasoning-based approach to Maries. Maj. Op. at 1021-22, n. 7. But quite the opposite is true. In Tidewater, Justice Rutledge (joined by Justice Murphy) held that Congress’ power to confer Article III jurisdiction was limited to the bases enumerated in the Constitution. See discussion supra, n.9. And four dissenting Justices expressly agreed with that holding. Of course, Justice Rutledge and the four dissenting Justices ultimately disagreed about whether Article Ill’s reference to ”citizen[s] of a state” should be understood as encompassing District of Columbia citizens. This disagreement led the two factions of Justices to vote for different case results. But all six Justices voted to hold that the Constitution provided the starting point for the Court’s analysis; Congress had no authority to add new bases for Article III jurisdiction by statute. Tidewater and its progeny hold that we are bound by holdings from splintered Court opinions that garner the five or more votes from the Court.
Consideration of dissenting opinions to derive the "narrowest grounds” does not focus on the various reasonings as determinative of results. Indeed, it is just the opposite. Consideration of dissenting opinions is done not for the purpose of combining the rationales — an impossible task, since they are contradictory — but for predicting the vote (the result) which the dissenting opinions would add to the plurality opinion’s votes for the next analogous case.
It is not the contradictory rationales that combine in Tidewater to result in a rule that "Congress may not expand the scope of subject-matter jurisdiction conferred by Article III through passage of a Congressional Act.” See supra, at pp. 1039-40. It is the combined results of Justice Rutledge’s and Justice Murphy's votes in favor of such a rule, plus the similar votes of the four dissenting Justices on that same issue that established the rule.
Seen from the other side of the case, it is the combination of the result of the votes of the 3-member plurality that Congress had the power to so expand subject-matter jurisdiction, with the 2-member concurrence, which vehemently rejected such power, but found that Art. Ill itself was originally intended to include D.C. citizens for purposes of establishing diversity of citizenship jurisdiction, that established the rule.
It was not a rule “derived by combining the 'views’ or ’rationales[s]’ of Tidewater’s concurrence and dissent.” Majority Op. 1022, n. 7. Just the opposite. It was a rule derived from the votes of the Justices, notwithstanding contradictory views or rationales used to explain the votes.
I note the Majority’s "logical subset” also cannot be squared with Tidewater, as neither opinion in Tidewater was a logical subset of the other, and yet we have derived a binding holding from that splintered decision.